15-2869-cr
*United States v. Sampson*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2017

(Argued: December 7, 2017       Decided: August 6, 2018)

No. 15-2869-cr

_____

UNITED STATES OF AMERICA,

*Appellant,*

-v.-

JOHN SAMPSON,

*Defendant-Appellee.*

_____

Before:       CABRANES, LIVINGSTON, and CARNEY, *Circuit Judges*.

The United States appeals from an August 12, 2015 judgment of the United States District Court for the Eastern District of New York (Irizarry, *C.J.*), granting the Defendant-Appellee's Federal Rule of Criminal Procedure 12(b) motion to dismiss two counts of an indictment charging him with federal-program embezzlement. The Defendant-Appellee, John Sampson ("Sampson"), allegedly embezzled funds from escrow accounts that he oversaw in his capacity as a referee for foreclosure actions. The district court dismissed the embezzlement counts as time-barred by 18 U.S.C. § 3282(a)'s five-year statute of limitations. The district court concluded that Sampson's embezzlement of the funds at issue was

1

"complete" when he failed to remit the funds more than a decade before the grand jury returned its indictment. We hold that the district court made a premature factual determination regarding the time at which Sampson, if guilty, formed the requisite fraudulent intent. Accordingly, we **VACATE** the judgment of the district court, **REINSTATE** the two federal-program embezzlement counts of Sampson's indictment, and **REMAND** the case for further proceedings consistent with this opinion.

> ALEXANDER A. SOLOMON, Assistant United States Attorney (David C. James, Paul Tuchmann, and Marisa M. Seifan, Assistant United States Attorneys, *on the brief*), *for* Richard P. Donoghue, United States Attorney for the Eastern District of New York, Brooklyn, NY, *for Appellant*.
>
> JOSHUA COLANGELO-BRYAN (Nathaniel H. Akerman, *on the brief*), Dorsey & Whitney LLP, New York, NY, *for Defendant-Appellee*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

From 1997 to 2015, John Sampson ("Sampson") served as a member of the New York State Senate, representing the 19th Senate District in Brooklyn. Sampson also served as a referee in foreclosure actions for properties located in Kings County, Brooklyn. By 2013, Sampson had purportedly embezzled approximately $440,000 from escrow accounts that he oversaw as a referee. To prevent discovery

of his embezzlement, Sampson allegedly made efforts to tamper with witnesses and provided false statements to federal law enforcement officials.[1]

On April 29, 2013, a grand jury in the United States District Court for the Eastern District of New York returned an indictment against Sampson that charged him with, among other things, two counts of federal-program embezzlement under 18 U.S.C. § 666(a)(1)(A) in connection with his service as a referee. The indictment alleges that, after receiving surplus funds from foreclosure proceedings in 1998 and 2002 and placing the funds into escrow accounts, Sampson failed to remit the funds to the Kings County Clerk ("KCC"), as he was required to do. Over time, Sampson removed money from the escrow accounts by cash withdrawals and electronic transfers. The indictment alleges that Sampson

---

[1] In this case's companion appeal, *United States v. Sampson*, No. 17-343-cr, Sampson appeals from a judgment entered after a jury trial at which Sampson was found guilty of obstruction of justice, in violation of 18 U.S.C. § 1503(a), and two counts of making false statements, in violation of 18 U.S.C. § 1001(a)(2). This instant appeal by the government is concerned solely with the district court's pretrial dismissal of two acts of embezzlement that Sampson purportedly committed in 2008.

committed (at least) two discrete acts of embezzlement in 2008. These acts form

the basis for the indictment's two embezzlement counts.[2]

Before trial, Sampson moved to dismiss the two embezzlement counts

under Federal Rule of Criminal Procedure 12(b). Among other things, Sampson

argued that the two acts of embezzlement that the indictment alleged occurred in

2008 *actually* occurred in 1998 and 2002, when Sampson failed to remit the funds

to the KCC. Because 18 U.S.C. § 3282(a) imposes a five-year statute of limitations

on prosecutions for embezzlement under 18 U.S.C. § 666(a)(1)(A), Sampson

argued that the district court should dismiss the counts as time-barred. The district

court granted Sampson's motion, holding as a matter of law that the

embezzlements in question were "complete" in 1998 and 2002, over five years

before the grand jury returned its 2013 indictment.

On appeal, the government contends that the district court erred by

concluding pretrial, and as a matter of law, that Sampson necessarily formed the

fraudulent intent required for the charged embezzlements—and thus completed

---

[2] The government later filed multiple superseding indictments, each of which contain virtually identical embezzlement counts. For the sake of clarity, we will refer to the counts in the Third Superseding Indictment, which the government filed on July 30, 2014.

4

those embezzlements—once he failed to remit the funds. We agree. Accordingly, we reinstate the two federal-program embezzlement counts of Sampson's indictment and remand for further proceedings consistent with this opinion.

**BACKGROUND**

**I.  Factual Background**[3]

Sampson was admitted to the New York Bar in 1992. Beginning in the 1990s, Justices of the Supreme Court of the State of New York periodically appointed Sampson to serve as a referee in foreclosure actions for Kings County properties. Sampson's duties as a referee included conducting the sale of a foreclosed property, using the proceeds of the sale to pay any outstanding lienholders, and tendering any remaining surplus funds to the KCC. The KCC would then allow the prior owners of the property—as well as "any other interested parties"—to collect from these surplus funds. Gov't App'x at 39, ¶ 12.

As noted above, Sampson also served as a member of the New York State Senate from 1997 to 2015, representing the 19th Senate District in Brooklyn.

---

[3] Unless otherwise stated, the facts outlined below are either undisputed or taken directly from Sampson's indictment, the allegations of which we assume as true for purposes of this appeal. *See United States v. Rosengarten*, 857 F.2d 67, 78 (2d Cir. 1988).

Sampson held many high-ranking roles during his tenure in the Senate, including leader of the Democratic Conference of the Senate from June 2009 to December 2012, and Minority Leader of the Senate from January 2011 to December 2012. Sampson continued to serve as a referee for foreclosure actions in Kings County during his time in the Senate.

The embezzlement counts in Sampson's indictment focus on Sampson's alleged misappropriation of surplus funds in two foreclosure actions in Brooklyn: one involving property located at 165 Forbell Street ("the Forbell Street Property"), and the other involving property located at 1915 Eighth Avenue ("the Eighth Avenue Property").

### 1. The Forbell Street Property Action

On February 17, 1998, a Justice of the Supreme Court of the State of New York appointed Sampson as referee for the foreclosure sale proceeding for the Forbell Street Property. On October 7, 1998, Sampson informed the Supreme Court that the foreclosure sale resulted in surplus funds of approximately $84,000. As required by the court order and judgment in the case, Sampson placed these funds in escrow in a bank account. Sampson registered the account under the name "John L. Sampson as Referee" (the "Forbell Street Referee Account"). Although

the court order directed Sampson to open this escrow account at Citibank, Sampson opened it at Chase Bank.

The court order also required Sampson to remit the surplus funds to the KCC within five days of receiving and ascertaining them. State law imposed the same obligation. *See* N.Y. Real Prop. Acts. L. § 1354(4). But Sampson failed to do so—and in fact never remitted the surplus funds. Instead, between July 1998 and June 2008, Sampson withdrew or transferred approximately $80,000 of the $84,000 surplus from the escrow account for his own use. For example (and as specified in the indictment), on or about February 13, 2008, Sampson transferred $8,000 from the Forbell Street Referee Account into his personal bank account.

### 2. The Eighth Avenue Property Action

On March 18, 2002, a Justice of the Supreme Court of the State of New York appointed Sampson as a referee for the foreclosure sale proceeding for the Eighth Avenue Property. On June 28, 2002, Sampson informed the Supreme Court that the foreclosure sale resulted in surplus funds of approximately $80,000. As required by the judgment in that case, Sampson placed these funds in escrow in a bank account registered under the name "John L. Sampson Recv [Receiver] Fleet National Bank" ("Eighth Avenue Referee Account"). Although the court order

7

directed Sampson to open this escrow account at an Independence Savings Bank branch office, Sampson opened it at an HSBC branch office instead. Much like the Forbell Street Property foreclosure, both the judgment in the Eighth Avenue Property Action and New York State law required Sampson to remit the surplus funds to the KCC within five days of receiving and ascertaining them. But Sampson never did so. Starting in approximately 2002, he gradually removed funds from the account. By July 2006, a balance of only $55,167.94 remained.

On or about July 20, 2006, Sampson asked a Queens businessman named Edul Ahmad ("Ahmad") to help him repay money that he had misappropriated. Ahmad agreed to help Sampson. On or about July 21, 2006, Ahmad provided Sampson with three bank checks totaling $188,500. One of the bank checks was in the amount of $27,500. The apparent purpose of this bank check was to allow Sampson to replenish the money he had taken from the Eighth Avenue Referee Account. Accordingly, Sampson combined the $27,500 check with the $55,167.94 remaining in the Eighth Avenue Referee Account to purchase a bank check in the amount of $82,677.94. This bank check was made payable to the KCC.

But Sampson never gave this check to the KCC. Instead, about two years later, on June 7, 2008, Sampson exchanged this $82,677.94 bank check for eight

8

bank checks worth $10,000 each, and one bank check for $2,667.94. Each of the checks was made payable to "John Sampson." On or about and between June 12, 2008 and January 12, 2009, Sampson redeemed two of the $10,000 bank checks for cash, negotiated the $2,667.94 bank check, and deposited three of the $10,000 bank checks into his personal bank account. Sampson simply retained (and never negotiated) the remaining three $10,000 checks.

## II. Procedural History

As noted above, on April 29, 2013, a grand jury in the United States District Court for the Eastern District of New York returned a nine-count indictment against Sampson, charging him with, *inter alia*, two counts of federal-program embezzlement. Count 1 charges Sampson with embezzling funds from the Forbell Street Referee Account. It alleges that Sampson committed embezzlement under 18 U.S.C. § 666(a)(1)(A) on or about February 13, 2008, when he transferred $8,000 from the Forbell Street Referee Account into his personal bank account.[4] Count 2 concerns Sampson's alleged embezzlement from the Eighth Avenue Referee

---

[4] Sampson entered into an agreement with the government that tolled the relevant statute of limitations from February 1, 2013 up to and including May 17, 2013.

Account. Count 2 alleges that Sampson committed embezzlement under 18 U.S.C. § 666(a)(1)(A) on or about June 7, 2008 when he exchanged the $82,677.94 bank check made out to KCC for nine bank checks made payable to Sampson himself.

On June 20, 2014, Sampson moved to dismiss Counts 1 and 2 of the indictment pursuant to Federal Rule of Criminal Procedure 12(b). Sampson argued, *inter alia*, that 18 U.S.C. § 3282(a) imposes a five-year statute of limitations on prosecutions for embezzlement under § 666(a)(1)(A), and that the embezzlements at issue in this case were "complete"—and the statute of limitations began to run—when he failed to remit the surplus funds to the KCC in 1998 and 2002. The government opposed Sampson's motion, arguing, *inter alia*, that Sampson's Rule 12(b) motion was not ripe, since the government had not yet proffered all of its evidence as to when Sampson formed his allegedly fraudulent intent and converted the funds.

The district court held oral argument on Sampson's Rule 12(b) motion on October 23, 2014. At a status conference on October 31, 2014, the district court judge, from the bench, rejected the government's argument that Sampson's Rule 12(b) motion was not ripe, granted the motion, and accordingly dismissed Counts 1 and 2. The judge orally explained that "the effective date of the embezzlement

[was] the time [at] which [Sampson] did not return to the Kings County Clerk the surplus monies that were in the foreclosure accounts. . . . That means that the charges that have been brought based on the withdrawals in February of 2008 and in June of 2008 for Counts [1] and [2], respectively, are outside the statute of limitations." Gov't App'x at 174–75. The judge stated that a written opinion would be forthcoming.

A jury trial on the remaining charges in the indictment commenced on June 22, 2015 and ended on July 24, 2015. On August 12, 2015, the district court issued a formal opinion and order memorializing the dismissal of the two embezzlement counts. The opinion concluded that Sampson's embezzlement was "complete" for purposes of the five-year statute of limitations when he failed to remit the surplus funds to the KCC:

> [T]he statutes of limitations have long since expired for Counts 1 and 2. Defendant was obligated under court orders and [New York real property law] to remit the surplus funds within five days of filing his referee reports. . . . On the sixth day, when he did not return the funds, Defendant appropriated the funds and completed the embezzlement.

*United States v. Sampson*, 122 F. Supp. 3d 11, 20 (E.D.N.Y. 2015). The decision of August 12, 2015 constituted a final judgment on the embezzlement counts. The government timely appealed the district court's decision.

**DISCUSSION**

Because the district court's dismissal of Counts 1 and 2 of the indictment raises questions of law, our review is *de novo*. *See United States v. Gundy*, 804 F.3d 140, 145 (2d Cir. 2015).

**I**

Section § 666(a)(1)(A) of Title 18 prohibits "an agent of an organization[] or of a State, local, or Indian tribal government, or any agency thereof" that receives over $10,000 in federal funding during any one-year period from "embezzl[ing], steal[ing], obtain[ing] by fraud, or otherwise without authority knowingly convert[ing] to the use of any person other than the rightful owner or intentionally misappl[ying], property that . . . is valued at $5,000 or more, and . . . is owned by, or is under the care, custody, or control of such organization, government, or agency." 18 U.S.C. §§ 666(a)(1)(A), 666(b). Counts 1 and 2 of the indictment charge Sampson with "embezzlement" under this provision. Thus, Counts 1 and 2 must sufficiently allege that: (1) Sampson "embezzle[d] . . . property that is valued at

12

$5,000 or more"; (2) Sampson did so while serving as "an agent of an organization[] or of a State, local, or Indian tribal government, or any agency thereof" that receives over $10,000 of federal funding during any one-year period; and (3) the property at issue was "owned by, or [was] under the care, custody, or control of [that] organization, government, or agency." *See id.*

18 U.S.C. § 3282(a) states that "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." If a defendant raises a statute-of-limitations defense under § 3282(a), the government bears the burden of proving compliance with the statute to a jury beyond a reasonable doubt. *See United States v. Martinez*, 862 F.3d 223, 235 (2d Cir. 2017); *United States v. Florez*, 447 F.3d 145, 150 n.2 (2d Cir. 2006). Both parties agree that § 3282(a)'s five-year statute of limitations applies to prosecutions for embezzlement under § 666(a)(1)(A). This five-year period begins to run the moment a crime "ha[s] been committed." 18 U.S.C. § 3282(a). In other words, the five-year window for prosecution opens "when a crime is '*complete*,' thereby 'encouraging law enforcement officials promptly to investigate suspected criminal activity.'" *United States v. Williams*, 733

13

F.3d 448, 453 (2d Cir. 2013) (emphasis added) (quoting *United States v. Rivera-Ventura*, 72 F.3d 277, 281 (2d Cir. 1995)). A crime is "complete as soon as every element in the crime occurs." *United States v. Vebeliunas*, 76 F.3d 1283, 1293 (2d Cir. 1996) (quoting *United States v. Musacchio*, 968 F.2d 782, 790 (9th Cir. 1991)). Thus, in this case, the five-year statute of limitations for embezzlement under § 666(a)(1) began to run as soon as every element in Sampson's alleged crimes had taken place.

That brings us to the meaning of "embezzlement" for purposes of § 666. Section 666 does not define "embezzlement." We must therefore interpret the word according to its traditional meaning. *See Sekhar v. United States*, 570 U.S. 729, 732 (2013); *In re Sherman*, 603 F.3d 11, 13 (1st Cir. 2010) ("There being no definition of embezzlement . . . in the Bankruptcy Code, we assume that Congress wrote with the common law in mind" (citations omitted)). "Embezzlement" is historically defined as "the fraudulent appropriation of property by a person to whom such property has been intrusted, or into whose hands it has lawfully come." *Moore v. United States*, 160 U.S. 268, 269 (1895). An individual commits "embezzlement" when he: (1) with intent to defraud; (2) converts to his own use; (3) property belonging to another; in a situation where (4) the property initially lawfully came

14

within his possession or control. *See United States v. Clark*, 765 F.2d 303–04 (2d Cir. 1985); 3 Wayne R. LaFave, *Substantive Criminal Law*, § 19.6 (2d ed. 2003). Element (1), intent, is the *mens rea* of "embezzlement."[5] Elements (2), (3), and (4) are the

[5] "To act with the 'intent to defraud' means to act willfully, and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself." *United States v. Cloud*, 872 F.2d 846, 852 n.6 (9th Cir. 1989). A "conversion" in this context consists of "the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights," which includes a "denial or violation of the [owner's] dominion, rights or possession" over his property. *See Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403–04 (2d Cir. 2006).

An individual charged with overseeing another's funds can "convert" those funds by intentionally failing to remit them despite the existence of a fiduciary duty to do so. *See* Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, *The Law of Torts* § 67 (2d ed. 2011) ("A bailee who is under an obligation to return goods when a specific event occurs may be liable as a converter when the event occurs and he fails to return the goods, whether or not the plaintiff demands them."). Importantly, the "intent" required for such an act to qualify as a "conversion" is not the same as an "intent to defraud." A "conversion" requires solely an "intent to exercise a dominion or control over the goods," in a manner that "is in fact inconsistent with [another's] rights." W. Page Keeton *et al.*, *Prosser and Keeton on the Law of Torts* § 15 (5th ed. 1984); *see also* Dobbs *et al.*, *supra*, at § 62 ("The defendant might believe the goods are his and that he has every right to deal with them, but, even so, he harbors the requisite intent [for a conversion] if he intends to act upon the goods."). An intent to defraud, by contrast, involves a "specific intent to deceive or cheat." *Cloud*, 872 F.2d at 852 n.6 (emphasis added). Thus, "[a] mere failure to pay over monies belonging to another[] without fraudulent intent"— while potentially a conversion—"is not [an] embezzlement." 29A C.J.S. *Embezzlement* § 19 (2018).

*actus reus* and attendant circumstances elements. When all four elements come together, an embezzlement is "complete" for statute-of-limitations purposes. *See Vebeliunas*, 76 F.3d at 1293.

## II

### A

The district court concluded that, as a matter of law, Sampson's embezzlement was "complete" when he failed to remit the surplus funds within five days to the KCC. Accordingly, the court granted Sampson's Rule 12(b) motion on statute-of-limitations grounds. *See Sampson*, 122 F. Supp. 3d at 20 ("When [Sampson] did not return the funds [on day six], and instead kept them in accounts under his name and to which he alone had access, he completed the crime of embezzlement."). Citing the undisputed facts that Sampson received the surplus funds at issue in 1998 and 2002; that he placed the funds in escrow accounts that he opened at banks other than those specified in the relevant court orders; and that he failed to remit the funds, as required, within five days, the district court concluded that "it is evident that [Sampson] embezzled the money from the Forbell Street Property in 1998 and the Eighth Street Property in 2002"—and that

16

"[o]n the sixth day, when he did not return the funds, Sampson . . . completed the embezzlement." *Id.* This, we conclude, was error.

In dismissing the embezzlement counts on Sampson's Rule 12(b) motion, the district court made an implicit factual determination that Sampson possessed the requisite fraudulent intent (if he possessed it at all) in 1998 and 2002, when he failed timely to remit the surplus funds.[6] As noted above, an embezzlement is not "complete" until an individual converts the property of another with fraudulent intent. *See, e.g.*, *United States v. Nolan*, 136 F.3d 265, 269 (2d Cir. 1998) ("[B]ecause

---

[6] Admittedly, the district court's opinion is somewhat ambiguous on this point. Although the court clearly recognized that embezzlement requires fraudulent intent, it also used language suggesting that an embezzlement is complete as a matter of law when an individual fails to remit funds in accordance with a legal obligation. *See, e.g.*, *Sampson*, 12 F. Supp. 3d at 19–20 ("[T]he offense of embezzlement is completed as soon as there has been an actual taking of the property. . . . [Accordingly, the moment that Sampson] did not return the [escrow] funds, [he] appropriated the funds and completed the embezzlement." (internal quotation marks omitted) (quoting *United States v. Sunia*, 643 F. Supp. 2d 51, 75 (D.D.C. 2009))). We therefore read the district court as having made a determination that if Sampson committed the crime at all, he necessarily possessed the requisite fraudulent intent—and thereby completed the alleged embezzlement offenses—outside the statute of limitations. We also read the district court as having determined (again implicitly) that the *actus reus* of conversion took place, if at all, in 1998 and 2002, and not, as charged, when Sampson allegedly removed the $8,000 from the Forbell Street Referee Account and exchanged the monies reflected in the $82,677.94 KCC bank check for checks made out to himself.

17

embezzlement is a criminal offense, proof of unlawful or criminal intent is necessary . . . ."); *see also* 29A C.J.S. Embezzlement § 19 (2018) ("[For] fiduciary embezzlement, the requisite [fraudulent] intent need not coincide with the accused's actual taking of the property . . . ."). Accordingly, in concluding that the embezzlements charged in Counts 1 and 2 were complete, respectively, in 1998 and 2002, the district court necessarily found that if Sampson possessed the requisite fraudulent intent, he possessed it at that time, providing him with a statute-of-limitations defense.

We conclude that this pretrial factual finding constituted a premature adjudication as to the sufficiency of the government's evidence and was thus improper at the Rule 12(b) stage. To be clear, Rule 12(b) allows "[a] party [to] raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). In some circumstances, moreover, a party may raise and establish a statute-of-limitations defense via a Rule 12(b) motion, such as when the defense is clear from the face of the indictment. *See, e.g.*, *Toussie v. United States*, 397 U.S. 112, 113–14 (1970) (noting that a defendant charged in 1967 under an indictment alleging a willful failure to register for the draft in 1959 may raise the statute-of-limitations issue in a pre-trial

18

motion). But when such a defense raises dispositive "evidentiary questions," a district court must defer resolving those questions until trial. *See United States v. Knox*, 396 U.S. 77, 83 & 83 n.7 (1969); *see also United States v. Wilson*, 26 F.3d 142, 159 (D.C. Cir. 1994) ("[A] decision on a [Rule 12] motion should be deferred[] if disposing of the motion involves deciding issues of fact that are inevitably bound up with evidence about the alleged offense itself."); *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986) ("If [a] pretrial claim is 'substantially founded upon and intertwined with' evidence concerning the alleged offense, the motion falls within the province of the ultimate finder of fact and must be deferred." (quoting *United States v. Williams*, 644 F.2d 950, 953 (2d Cir. 1981))). Here, the government disputes the precise timing of Sampson's alleged fraudulent conversion and argued before the district court that it was premature to adjudicate Sampson's statute-of-limitations defense when the indictment was sufficient on its face and the government had not proffered all its evidence. In rejecting this argument, the district court essentially granted "summary judgment" to Sampson. Because the civil summary judgment mechanism does not exist in federal criminal procedure and the district court acted prematurely in

addressing the statute-of-limitations issue, we vacate the district court's decision

of August 12, 2015, reinstate the two embezzlement counts, and remand.

**B**

The drafters of the Federal Rules of Criminal Procedure "cross-pollinated"

the Rules with principles from the Federal Rules of Civil Procedure. James Fallows

Tierney, Comment, *Summary Dismissals*, 77 U. Chi. L. Rev. 1841, 1843 (2010).[7]

Conspicuously absent from the Federal Rules of Criminal Procedure, however, is

an analogue for summary judgment under Federal Rule of Civil Procedure 56. *See*

*United States v. Yakou*, 428 F.3d 241, 246 (D.C. Cir. 2005) ("There is no federal

criminal procedural mechanism that resembles a motion for summary judgment

in the civil context."); *accord United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012);

---

[7] Federal Rule of Criminal Procedure 7, for example, which governs the presentment of an indictment, was modeled after Federal Rule of Civil Procedure 8, which governs the presentment of a pleading. *See* Fed. R. Crim. P. 7; Fed. R. Civ. P. 8; Jesse Jenike-Godshalk, Comment, *"Plausible Cause"?: How Criminal Procedure Can Illuminate the U.S. Supreme Court's New General Pleading Standard in Civil Suits*, 79 U. Cin. L. Rev. 791, 807 (2010). Federal Rule of Criminal Procedure 12, which concerns, *inter alia*, motions to dismiss facially deficient indictments, resembles Federal Rule of Civil Procedure 12, which concerns, *inter alia*, motions to dismiss facially invalid complaints. *See* Fed. R. Crim. P. 12; Fed. R. Civ. P. 12. And Federal Rule of Criminal Procedure 29, which allows a party to move for a judgment of acquittal, is similar to Federal Rule of Civil Procedure 50, which allows a party to move for a judgment as a matter of law. *See* Fed. R. Crim. P. 29; Fed. R. Civ. P. 50.

*United States v. Pope*, 613 F.3d 1255, 1259–60 (10th Cir. 2010) (Gorsuch, *J.*); *United States v. Salman*, 378 F.3d 1266, 1268 (11th Cir. 2004) (per curiam); *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002); *United States v. Nabors*, 45 F.3d 238, 240 (8th Cir. 1995). Motions for summary judgment allow judges to examine the evidence adduced by both sides before trial and award judgment if, based on the proffered evidence, no rational trier of fact could find for the non-moving party. *See* Fed. R. Civ. P. 56(a); *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). The summary judgment motion in civil actions existed at the time of the creation of the Federal Rules of Criminal Procedure, but the Rules' drafters decided not to transplant this particular flower out of the foreign soil of civil procedure. *See* Ion Meyn, *Why Civil and Criminal Procedure Are So Different: A Forgotten History*, 86 Fordham L. Rev. 697, 710 (2017). Accordingly, although a judge may dismiss a civil complaint pretrial for insufficient evidence, a judge generally cannot do the same for a federal criminal indictment. *See United States v. Williams*, 504 U.S. 36, 53 (1992); *United States v. Calandra*, 414 U.S. 338, 345 (1974); *Costello v. United States*, 350 U.S. 359, 363–64 (1956); *see also United States v. Guerrier*, 669 F.3d 1, 4 (1st Cir. 2011) ("[C]ourts

routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations . . . .").

This distinction between federal civil and criminal procedure comports with broader differences between the civil and criminal regimes. First, federal criminal discovery is far more limited than federal civil discovery. When the federal government acts as prosecutor in a criminal case, it does not face the same mandatory disclosure regime as when it acts as plaintiff in a civil case. *Compare, e.g.*, Fed. R. Crim. P. 16(a), *with* Fed. R. Civ. P. 26. To be clear, a federal criminal defendant can compel the government to disclose specified materials simply by asking for them, *see, e.g.*, Fed. R. Crim. P. 12.1(b), 12.2, 12.3, 16(a), and certain statutory provisions and constitutional mandates require significant disclosures, *see, e.g.*, 18 U.S.C. § 3500(b); *Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963). But the fact remains that federal civil and criminal procedure are different, and that "unlike their civil counterparts, criminal proceedings have no extensive discovery . . . procedures requiring both sides to lay their evidentiary cards on the table before trial." *Pope*, 613 F.3d at 1259–60; *see also United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974) (affirming a district court's "refus[al] to order compliance with all of [the defendant's] very broad

demands for discovery," because "[t]he government was not required to disclose its evidence in advance of trial"); David A. Sklansky & Stephen C. Yeazell, *Comparative Law Without Leaving Home: What Civil Procedure Can Teach Criminal Procedure, and Vice Versa*, 94 Geo. L.J. 683, 713–14 (2006) (describing how criminal proceedings often rely on an element of surprise at trial in a way that civil proceedings do not).

This has implications for the proper construction of Rule 12(b). Permitting civil "summary judgment"-like motions under this Rule would enable an end-run around the calibrated framework for discovery in criminal cases. To overcome such motions, the government might need to reveal its complete case before trial. But this would upset the policy choices reflected in the criminal discovery rules—and provide an advantage to the defense that the Rules' drafters did not intend.[8]

---

[8] We need not elaborate here on the numerous rationales for more calibrated discovery in federal criminal, as opposed to civil, cases. Suffice it to say that even as there has been a trend in recent decades to somewhat broader discovery in federal criminal cases, concerns persist regarding: legal and practical constraints on the ability to afford reciprocal discovery against the criminal defendant; whether full disclosure of the government's case facilitates defense perjury; and whether such concerns as these militate against broader discovery by the prosecution, given its heavy burden of proof. *See* 5 Wayne R. LaFave *et al.*, *Criminal Procedure* § 20.1(b) (4th ed. 2017); 2 Charles Alan Wright *et al.*, *Federal Practice & Procedure: Criminal* § 251 (4th ed. 2018); Steven A. Saltzburg & Daniel J.

Even more fundamentally, authorizing district court judges to resolve dispositive fact-based evidentiary disputes on Rule 12(b) motions risks invading "the inviolable function of the jury" in our criminal justice system. *See Lopez for & in Behalf of Garcia v. Curry*, 583 F.2d 1188, 1192 (2d Cir. 1978). Judges can, of course, make factual determinations in matters that do not implicate the general issue of a defendant's guilt, *see* Fed. R. Crim. P. 12(b), 12(d), such as motions to suppress evidence, *see* Fed. R. Crim. P. 12(b)(3)(C), selective prosecution objections, *see* Fed. R. Crim. P. 12(b)(3)(A)(iv), and objections concerning discovery under Rule 16, *see* Fed. R. Crim. P. 12(b)(3)(E). But when a defense raises a factual dispute that is inextricably intertwined with a defendant's potential culpability, a judge cannot resolve that dispute on a Rule 12(b) motion. *See United States v. Schafer*, 625 F.3d 629, 635 (9th Cir. 2010) ("[I]f [a] pretrial motion raises factual questions associated

---

Capra, *American Criminal Procedure* 973–75 (9th ed. 2010). In addition, as the Supreme Court recently noted, affording federal criminal defendants a "sneak preview" of the government's case could "facilitate witness tampering [and] jeopardize witness safety." *Kaley v. United States*, 134 S. Ct. 1090, 1101–02 (2014). Federal criminal discovery rules contain numerous safeguards to protect the identities of government witnesses until they testify at trial. *See, e.g.*, 18 U.S.C. § 3500(a); Fed. R. Crim. P. 26.2(a); *see also United States v. Ruiz*, 536 U.S. 622, 631–32 (2002); Ronald J. Allen *et al.*, *Comprehensive Criminal Procedure* 1190–91 (4th ed. 2016).

with the validity of [a] defense, the district court cannot make those determinations. Doing so would 'invade the province of the ultimate finder of fact.'" (citation omitted) (quoting *Shortt Accountancy*, 785 F.2d at 1452)); *see also United States v. Williams*, 644 F.2d 950, 952–53 (2d Cir. 1981) ("[I]t would be impractical and unwise to attempt pretrial resolution of the [defendant's] due process claims, because they are substantially founded upon and intertwined with the evidence to be presented at trial."). Because of this critical fact-finding role of the jury, the Supreme Court has admonished that "where intent of the accused is an ingredient of the crime charged, its existence is a question of fact" that a judge cannot resolve on the jury's behalf. *Morissette v. United States*, 342 U.S. 246, 274 (1952). The same rationale must apply to a statute-of-limitations defense that turns on the precise timing of a defendant's fraudulent conversion. *See United States v. Sams*, 865 F.2d 713, 716 (6th Cir. 1988) (explaining that a willful failure to pay a tax is "complete" for statute-of-limitations purposes not when an individual fails to pay the tax, but rather when "the failure to pay the tax *becomes* willful" (emphasis added) (quoting *United States v. Andros*, 484 F.2d 531, 532 (9th Cir. 1973))).

25

Here, Sampson's Rule 12(b) motion effectively asked the district court to make a factual finding about the precise moment at which he acted with fraudulent intent to convert the funds at issue in this case. Rule 12, however, "permits pretrial resolution of a motion to dismiss the indictment only when 'trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense.'" *Pope*, 613 F.3d at 1259 (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969)). The question of *when* Sampson possessed fraudulent intent as to the sums specified in Counts 1 and 2 was inherently intertwined with the question of *whether* he possessed fraudulent intent—one of the elements of embezzlement. Such a question might have been resolvable pretrial in a civil case. But it was not resolvable pretrial, in a criminal setting, on the record here.

## C

To be sure, in *United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998), we outlined a narrow exception to the rule that a court cannot test the sufficiency of the government's evidence on a Rule 12(b) motion. In *Alfonso*, the district court dismissed a Hobbs Act robbery count pretrial in response to the defendants' Rule 12(b) motion, concluding that "the Government [failed to adduce] sufficient facts

to establish a nexus between the robbery allegedly committed by [the defendants] and any obstruction of interstate commerce." *Id.* at 773–74. As here, we held that the district court's "inquiry into the sufficiency of the [government's] evidence" on this issue "was premature." *Id.* at 776. We distinguished *United States v. Mennuti*, 639 F.2d 107 (2d Cir. 1981), which upheld a pretrial sufficiency-of-the-evidence ruling where the government had voluntarily submitted an affidavit containing the entirety of its proof. *Alfonso*, 143 F.3d at 777; *see also Mennuti*, 639 F.2d at 108 & n.1. *Alfonso* made clear that "[u]nless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial," the sufficiency of the evidence is not appropriately addressed by a Rule 12(b) motion pretrial. *Alfonso*, 143 F.3d at 776–77.[9]

The exception employed in *Mennuti* and elaborated on in *Alfonso* is extraordinarily narrow. As *Alfonso* states, the government must make a "detailed presentation of the entirety of the evidence" before a district court can dismiss an indictment on sufficiency grounds. *Id.* at 777. Moreover, our research reveals—and

---

[9] Although *Alfonso* referred only to the "jurisdictional" element of an offense, we have since clarified that its holding applies to any element of an offense. *See United States v. Perez*, 575 F.3d 164, 166–67 (2d Cir. 2009).

the parties cite—no federal appellate case upholding the authority of a district court to *require* the government, before trial, to make such a presentation. Indeed, if the district court possessed such authority, it could effectively force a summary judgment-like motion on the government—and, as explained above, summary judgment does not exist in federal criminal procedure. *See Huet*, 665 F.3d at 595; *Pope*, 613 F.3d at 1259–60; *Yakou*, 428 F.3d at 246; *Salman*, 378 F.3d at 1268.[10]

Simply put, the government in Sampson's case cannot "fairly" be said to have made "a full proffer of the evidence it intends to present at trial" concerning the precise time at which Sampson formed the intent to fraudulently convert the funds at issue in Counts 1 and 2. *See Alfonso*, 143 F.3d at 776–77. There was some dispute about this point at oral argument. Sampson's counsel posited that the government had in fact made a "full proffer" of its evidence. But we cannot conclude that to be the case. During a hearing, the district court asked the

---

[10] We further note that the Supreme Court's decision in *Kaley v. United States*, 134 S. Ct. 1090 (2014), may cast doubt on the continued viability of even this narrow exception. *See* LaFave, *Criminal Procedure*, *supra*, § 15.5(a) ("*Kaley* arguably indicates . . . that the grand jury determination as to evidence sufficiency cannot be contradicted pretrial by a process that finds inadequacy in other sources of evidence."). We need not address the question, however, because even assuming that the exception remains viable, Sampson's case does not fall within it.

government whether it had other evidence to support its position concerning the statute of limitations. *See* Gov't App'x at 102. The government proffered some additional evidence after the hearing. *See id.* at 159–67. But it was clear that the government had not yet proffered *all* of its evidence. *See, e.g., id.* at 102 (mentioning "statements attributed to Mr. Sampson, at the time that, for example, he created the 2006 check, the check in which he emptied the Eighth Avenue account . . . ."); *id.* at 145–46 (mentioning evidence that Sampson opened numerous referee accounts at incorrect banks—including accounts from which he apparently did not embezzle); *compare id.* at 170 (Sampson's counsel arguing that the government's additional proffer "really [didn't] add anything" and "just recite[d] what [was] already in the [i]ndictment"), *with Alfonso*, 143 F.3d at 777 ("The government's brief statement . . . cannot fairly be described as a full proffer for purposes of a pretrial ruling on the sufficiency of the evidence."). Indeed, in its opinion granting Sampson's motion to dismiss, the district court itself seemed to acknowledge the point. *See Sampson*, 122 F. Supp. at 18–19 ("The government's additional contention that the motion is premature because it has not proffered all of the evidence related to the embezzlements is also unavailing. Supplemental evidence would not alter the Court's decision . . . ."); *id.* at 19 n.8 ("[A]t the eleventh hour, the government

29

proffered additional evidence that *had no relevance or bearing on the Court's decision.*"

(emphasis added)).[11]

We agree with the district court that Sampson's placement of the surplus

funds at issue in banks other than those specified in court orders and his failure to

remit the funds within five days of their receipt could constitute evidence that he

possessed an intent to defraud with respect to these funds—thereby completing

any embezzlement offense with respect to the funds—outside the statute of

limitations. But this evidence is far from conclusive as a matter of law. Moreover,

it cannot be said that "trial of the facts surrounding the commission of the alleged

---

[11] It is worth contrasting the government's limited proffer in this case with the proffer that the government voluntarily submitted in *Mennuti*. That proffer consisted of a point-by-point outline of how the government would establish each element of the indictment's counts, including testimony that the government intended to present at trial. *See Mennuti*, 639 F.2d at 108 & n.1. As we noted in *Alfonso*, it can sometimes be to the government's benefit *voluntarily* to submit such a proffer: the government can appeal a Rule 12(b) pretrial determination that it lacks sufficient evidence to prove its case, but it cannot appeal a similar Rule 29 determination. *Alfonso*, 143 F.3d at 777 n.7. In any event, the record here does not permit the conclusion that there was such a comprehensive proffer, qualifying as a "detailed presentation of the entirety of the evidence that [the government] would present to a jury" regarding when Sampson allegedly formed the requisite fraudulent intent. *Id.* at 777. Absent a complete proffer, the district court could not inquire into the sufficiency of the government's case. *See id.*

offense would be of no assistance in determining the validity of [the statute of limitations] defense.'" *Pope*, 613 F.3d at 1259 (quoting *Covington*, 395 U.S. at 60).

Thus, consider Count 1, which alleges that Sampson "embezzle[d]" $8,000 from the Forbell Street Account "[o]n or about February 13, 2008." Gov't App'x at 52, ¶ 54. The indictment alleges that in 1998, Sampson placed the Forbell Street surplus funds into the escrow account and then failed to remit them. The indictment then alleges that Sampson engaged in periodic "cash withdrawals and electronic transfers" from the account starting around July 1998. Gov't App'x at 42, ¶ 20. A factfinder might consider such conduct to establish a referee's fraudulent intent, from the start, to convert all the money in the account to his own use, including money not yet removed. But such conduct would not constitute embezzlement as to proceeds not yet transferred or withdrawn if the referee, while neglectful of his legal obligation promptly to remit, never acted with the fraudulent intent to take control of the remaining funds for himself—meaning, to fraudulently convert them.[12] If that were the case as to Sampson, then his alleged

---

[12] The government argues that retaining funds in an escrow account beyond a court-imposed or statutory deadline is not uncommon, and not conclusive as to intent to defraud. *See* Br. for Appellant at 25–26. Indeed, at least one New York court described a practice in the 1950s pursuant to which court-appointed referees

31

periodic withdrawals from the account between July 1998 and June 2008 would constitute *individual and separate* acts of embezzlement (assuming, of course, that he acted with the requisite fraudulent intent in each case).[13] Sampson would have then "completed" the embezzlement for the $8,000 at issue in Count 1 only "on or about February 13, 2008," when the indictment alleges that he took the $8,000 out of the account (assuming, again, that he did so with the requisite fraudulent *mens rea*).[14]

---

would routinely retain surplus funds in escrow accounts until a court ordered their distribution, despite judgments requiring such funds to be remitted promptly to a court-designated depository. *See In re Ball's Will*, 115 N.Y.S.2d 148, 149 (N.Y. Sup. Ct. 1952) (addressing referee treatment of surplus funds from foreclosures in Queens County, New York).

[13] We do not opine on facts to be established at trial, nor take any view as to the validity of Sampson's statute-of-limitations defense. We note, however, that Eric Newton, a Kings County Court clerk, testified at Sampson's trial on the indictment's other counts that, on at least one occasion, Sampson remitted surplus funds from a foreclosure action on an untimely basis. *See* Notice of Filing of Official Transcript of Proceedings as to John Sampson Held on 6/24/2015, No. 1:13-cr-00269-DLI-1 (E.D.N.Y. Aug. 12, 2015), ECF 219 at 84. This testimony may constitute evidence that Sampson did not form the requisite fraudulent intent to embezzle the funds in the Forbell Street Account until he transferred them into his personal account. We also note that Ahmad testified that Sampson feared that law enforcement officials would discover that he had removed funds from the escrow accounts—not that he had failed to remit those funds in the first place. *Id.* at 107.

[14] Count 2 presents a more complex issue than Count 1. Count 2 alleges that Sampson embezzled $82,677.94 of the Eighth Avenue Surplus on or about June 7, 2008. Gov't App'x at 53, ¶ 56. According to the facts outlined earlier in the

To be clear, on the record before us, we do not know if the government will be able to prove that Sampson completed the alleged embezzlements within the statute of limitations. But that fact alone is not enough to mandate dismissal of Sampson's embezzlement counts, for "we simply cannot approve dismissal of an indictment on the basis of predictions as to what the trial evidence will be." *United States v. DeLaurentis*, 230 F.3d 659, 661 (3d Cir. 2000). On remand, if the government proceeds with Sampson's prosecution, a jury must be presented with the evidence as to when (if ever) Sampson's fraudulent intent arose regarding the $8,000 that he

---

indictment, however, Sampson had embezzled $27,500 of the $82,677.94 Eighth Avenue Surplus by July 21, 2006. *Id.* at 43, ¶ 24. The fact that Sampson is later alleged to have attempted to replace that money is irrelevant; an embezzlement offense is complete when all the elements are met, even if the defendant later attempts to return the money he took. *See United States v. Angelos*, 763 F.2d 859, 861 (7th Cir. 1985). Thus, even if Sampson lacked fraudulent intent for the remainder of the funds in the account until 2008, taking the indictment's allegations as true, Sampson could have embezzled—at most—$55,167.94 on or about June 7, 2008, not $82,677.94. Nonetheless, $55,167.94 is still "$5,000 or more," which is what § 666(a)(1)(A) requires for jurisdictional purposes. *See, e.g., United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) ("An indictment 'need not be perfect, and common sense and reason are more important than technicalities.'" (quoting *United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001))). Because Count 2 "contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet," we consider it sufficient for Rule 12(b) purposes. *See Russell v. United States*, 369 U.S. 749, 763 (1962) (internal quotation marks omitted).

33

allegedly transferred from the Forbell Street Referee Account in 2008, and the $55,167.94 reflected in the bank check payable to the KCC that he allegedly exchanged that same year for bank checks made payable to himself.

In sum, the question of the timing of Sampson's alleged fraudulent conversions is factual, not legal. And a factual dispute such as this one, going to a statute-of-limitations defense that is itself inextricably intertwined with an element of the crime (here, the *mens rea* of embezzlement) cannot be resolved on a Rule 12(b) motion—at least when, as here, the government has not yet proffered all of its evidence. The district court thus applied an erroneous legal standard to reach a premature conclusion. Accordingly, its pretrial order concluding that Sampson's alleged embezzlements were outside the statute of limitations as a matter of law must be vacated.

### III

Sampson argues that notwithstanding the above error, we should affirm the district court's decision on other grounds. We disagree.

First, Sampson contends that because the government purportedly took inconsistent positions on the fraudulent intent issue during its prosecution of the other counts in the indictment, it is somehow estopped from arguing that the

34

alleged embezzlements were "complete" in 2008. Sampson, however, cites no

relevant support for this proposition. The cases that Sampson cites in his brief—

*United States v. GAF Corp.*, 928 F.2d 1253 (2d Cir. 1991); *United States v. Salerno*, 937

F.2d 797 (2d Cir. 1991), *rev'd on other grounds*, 505 U.S. 317 (1992); *United States v.*

*Lopez-Ortiz*, 648 F. Supp. 2d 241 (D.P.R. 2009); and *United States v. Bakshinian*, 65 F.

Supp. 2d 1104 (C.D. Cal. 1999)—all concern the admissibility of a prior inconsistent

statement by the government as an admission by a party-opponent under Federal

Rule of Evidence 801(d)(2). These cases are far from enough to rebut the

extraordinarily strong presumption against applying equitable estoppel against

the government. *See, e.g.*, *Drozd v. I.N.S.*, 155 F.3d 81, 90 (2d Cir. 1998) ("The

doctrine of equitable estoppel is not available against the government 'except in

the most serious of circumstances,' and is applied 'with the utmost caution and

restraint.'" (internal citations omitted) (first quoting *United States v. RePass*, 688

F.2d 154, 158 (2d Cir. 1982); then quoting *Estate of Carberry v. Comm'r of Internal Revenue*, 933 F.2d 1124, 1127 (2d Cir. 1991))).[15]

Second, Sampson argues that we should affirm the dismissal of the two embezzlement counts on lack of subject-matter jurisdiction grounds. To the extent that Sampson's argument concerns the sufficiency of the government's evidence, we decline to address his argument, for the reasons explained above. To the extent that Sampson's argument challenges the sufficiency of the indictment, however, we reject his argument on the merits.

As described above, an individual can be convicted of federal-program "embezzlement" only if he was an "agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof" that "receive[d], in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, or other form of Federal assistance." 18

---

[15] To the extent that Sampson claims the *indictment* is deficient because it somehow alleges that Sampson embezzled the funds at issue both before and during 2008, we reject his argument. Nothing in the indictment stands for the proposition that Sampson embezzled *all* of the surplus funds when he failed to remit them in 1998 and 2002. Rather, the indictment alleges that Sampson *began* to embezzle surplus funds from the relevant accounts *around* that period. *See* Gov't App'x at 42, ¶ 20; *id.* at 43, ¶ 23.

U.S.C. §§ 666(a)(1)(A), 666(b). "Agent" is defined as "a person authorized to act on behalf of another person or a government," *id.* § 666(d)(1), and government "agency" includes "a subdivision of the . . . judicial . . . branch of government," *id.* § 666(d)(2). Sampson's indictment alleges that he "act[ed] on behalf of the Supreme Court [of the State of New York]" when he served as a referee for the foreclosure proceedings, and, as a result, was the Supreme Court's "agent." Gov't App'x at 37, ¶ 4; *id.* at 52, ¶ 54; *id.* at 53, ¶ 56. Furthermore, the indictment insists, "[i]n or about and between 2007 and 2009, the Supreme Court received in excess of $10,000 in federal grants each year." *Id.* at 40, ¶ 13. Therefore, the indictment claims, the Supreme Court was an "agency of state government that received benefits in excess of $10,000 under one or more Federal programs." *Id.* at 52, ¶ 54; *id.* at 53, ¶ 56.

Sampson challenges the indictment's—and, by extension, the government's—allegation on three grounds. First, Sampson claims that he was not an agent of the "Supreme Court of the State of New York" when he served as a referee, but rather an agent of the "Kings County Supreme Court." Sampson argues that "nothing authorized [him] to act on behalf of an entity known as 'the Supreme Court of the State of New York,'" and that "[t]he entity known as the

37

'Supreme Court of the State of New York' does not exist in any physical sense." Br. for Def.-Appellee at 25, 38. The problem, however, is that the New York State Constitution mentions only *one* "supreme court." *See* N.Y. Const. art. VI, § 1; *id.*, § 7 ("*The* supreme court shall have general original jurisdiction in law and equity." (emphasis added)). Accordingly, New York's highest tribunal, the New York Court of Appeals, has made clear that

> *the Supreme Court is a single great tribunal of general state-wide jurisdiction, rather than an aggregation of separate courts sitting in the several counties or judicial districts of the state.* "There is," we have stated, "but one supreme court in the state and the jurisdiction of its justices is coextensive with the state." That unity has been preserved throughout the court's history, as local tribunals of civil and of criminal jurisdiction have been merged with it.

*Schneider v. Aulisi*, 307 N.Y. 376, 381 (1954) (citations omitted) (emphasis added) (quoting *People ex rel. New York Cent. & Hudson Riv. R.R. Co. v. Priest*, 169 N.Y. 432, 435 (1902)). Because "[t]he interpretation of a state statute or constitutional provision made by that state's highest court is binding on a federal court," *Auerbach v. Rettaliata*, 765 F.2d 350, 352 (2d Cir. 1985), we cannot question the Court of Appeals' determination that, for the purposes of jurisdiction, there is no such entity as the "Kings County Supreme Court," but rather simply one "Supreme Court of the State of New York." While Sampson may therefore be correct that "[t]he entity known as 'the Supreme Court of the State of New York' does not exist

38

in any physical sense," it does exist in a legal sense, and that is all that matters for purposes of Sampson's argument.

Second, Sampson submits that even if he was an "agent" of a pertinent government agency, his agency terminated when the Forbell Street and Eighth Avenue Foreclosure Actions ended in 1999 and 2002, respectively. But the court orders that appointed Sampson as a referee contain no expiration date for his agency. And "[i]f the parties do not specify a duration for the agent's actual authority, it terminates after a reasonable period of time. *What is a reasonable time is an issue for the trier of fact*." Restatement (Third) Of Agency § 3.09 cmt. d (2018) (emphasis added). Accordingly, absent a voluntary and full proffer of the government's evidence, the issue of whether Sampson's agency terminated along with the foreclosure actions is one for the jury to resolve.

Finally, and in the alternative, Sampson argues that his agency terminated before 2008 when, according to the indictment, he committed multiple discrete acts of embezzlement. It is true that agency can sometimes terminate when, "without knowledge of the principal," the agent commits "a serious breach of loyalty to the principal." Restatement (Second) of Agency § 112 (1958). But we decline to read this principle into the definition of "agent" under § 666. If we did,

a government employee's "agency" would terminate the moment that he commits *any* crime, thereby rendering him outside the scope of § 666 for any future crime that he commits. That conclusion would not only run counter to the basic idea of § 666—*i.e.,* to "protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery," *Sabri v. United States*, 541 U.S. 600, 606 (2004)—but would also be deeply in conflict with the cases in which we have affirmed convictions for *multiple*, *separate* violations of § 666, *see, e.g.*, *United States v. Boyland*, 862 F.3d 279, 291 (2d Cir. 2017); *United States v. Coyne*, 4 F.3d 100, 108 (2d Cir. 1993). We reject Sampson's invitation to read such an obvious opportunity for subterfuge and abuse into § 666. Accordingly, we cannot affirm the district court's order dismissing of Sampson's embezzlement counts on alternative grounds.

## CONCLUSION

For the foregoing reasons, we **VACATE** the district court's August 12, 2015 judgment, **REINSTATE** Count 1 and Count 2 of Sampson's indictment, and **REMAND** to the district court for further proceedings consistent with this opinion.

40